UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EDWARD A. SCHERDER, DMD and
EDWARD A. SCHERDER, DMD, PA,

      Plaintiffs,

v.                                        Case No:  2:20-cv-697-JLB-NPM

ASPEN AMERICAN INSURANCE
COMPANY,

      Defendant.

## ORDER

On March 20, 2020, Governor Ron DeSantis issued Executive Order 20-72 which, among other things, suspended all non-emergency dental procedures with the hope of curbing the spread of coronavirus and conserving medical supplies. Complying with this Executive Order, Plaintiff Dr. Edward Scherder, DMD, closed his dental practice, which allegedly resulted in him losing more than $700,000 in income. He subsequently submitted a claim for that lost income to his business's property insurer, Defendant Aspen American Insurance Company ("Aspen"). Aspen denied the claim because Dr. Scherder's lost income did not arise from any physical damage to property and thus was not covered under the Policy. Now, Dr. Scherder and his dental practice are suing Aspen for breach of contract and a

declaration that the practice's incurred financial loss was covered under the Policy. (Doc. 1.)[1]

Aspen moves to dismiss Dr. Scherder's operative pleading, asserting that the Policy (Doc. 1-1) does not cover intangible, purely economic losses like those in the Complaint. (Doc. 19.) Not only does Dr. Scherder oppose the motion to dismiss (Doc. 34), but he also moves to amend his Complaint. (Doc. 29). As the Court will explain, under the plain and unambiguous terms of the Policy, lost income—with no accompanying physical property damage—is not a covered loss. And because Dr. Scherder's claim is inextricably intertwined with his loss of business income due to the coronavirus pandemic, his motion to amend fails for the same reason that Aspen's motion to dismiss succeeds. Accordingly, this case is **DISMISSED WITH PREJUDICE**.

## BACKGROUND[2]

It does not appear that Dr. Scherder has provided the Court with a copy of his actual insurance claim. Nevertheless, both the Complaint and the proposed amended complaint explain that he closed his dental practice after Governor

---

[1] For simplicity, this Order only references Dr. Scherder, notwithstanding the fact that his dental practice is a separately named Plaintiff.

[2] "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1274 n.1 (11th Cir. 1999). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under this standard, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

DeSantis issued the Executive Order prohibiting non-emergency patient access. (Doc. 1 at ¶ 30; Doc. 29-1 at ¶ 48.)[3]  Dr. Scherder maintains that this closure, and the resulting loss of income, is a covered loss under the Policy's Civil Authority provision.  (Doc. 1 at ¶ 41; Doc. 29-1 at ¶ 60.)

The Civil Authority provision limits coverage to physical damage to the property or any covered cause of loss as follows:

> 13. As respects practice income:
>
> b. Civil Authority
>
> We will pay for the actual loss of **practice income** . . . **you** sustain caused by action of civil authority that prohibits access to the described premises due to the direct physical **damage** to property, other than at the [insured] premises, caused by or resulting from any **covered cause of loss**.

(Doc. 1-1 at 121 § I.B.13.b (emphasis in original).)  Unless expressly excluded, the Policy defines a "covered cause of loss" as "all risk of direct physical loss" along with certain enumerated situations.  (Id. at 132.)  The policy defines "damage" as "partial or total loss of or damage to your covered property."  (Id. at 133.)  Read together, then, these definitions provide that the Policy does not cover claims for loss of practice income unless the lost income arises from some direct physical loss

---

[3] While Dr. Scherder does not attach a copy of the Executive Order to either of his pleadings, Aspen attaches it as an exhibit to its motion to dismiss.  (See Doc. 19-1 at App. 002–4.)  The Court may consider this document because it is central to Dr. Scherder's claims, and he does not challenge its authenticity.  SFM Holdings, Ltd. v. Banc of Am. Sec., LLC, 600 F.3d 1334, 1337 (11th Cir. 2010).  Alternatively, the Court may take judicial notice of the Executive Order as it is a public record.  Universal Express, Inc. v. SEC, 177 F. App'x 52, 53 (11th Cir. 2006) (citing Bryant, 187 F.3d at 1278).

or damage to property. This invites the question: is the coronavirus capable of causing some direct physical loss or damage to property?

In Aspen's view, "[u]nder the plain meaning of the Policy, coverage is limited to situations in which property has sustained 'direct physical damage,'" and the coronavirus did nothing to compromise any property's physical structure. (Doc. 19 at 14.) Indeed, Dr. Scherder's pleadings and the accompanying denial letter show that this is exactly why Aspen denied coverage: no "property sustained direct physical damage. Instead, the inability to continue [Dr. Scherder's] practice, in whole or part, is due to" the Executive Order. (Doc. 1-2 at 5.) Dr. Scherder counters that the likely presence of coronavirus particles impairs the value, usefulness, and normal operations of property, thereby causing direct physical harm, damage, and loss. (See Doc. 29-1 at ¶¶ 33–37, 40.) Alternatively, he argues that the virus rendered his business property uninhabitable for its intended purpose, thus satisfying "any policy requirement of physical damage or loss." (Doc. 34 at 18.)

## DISCUSSION

"In interpreting an insurance contract, [courts] are bound by the plain meaning of the contract's text." State Farm. Mut. Auto. Ins. Co. v. Menendez, 70 So. 3d 566, 569 (Fla. 2011). When faced with an undefined term, the Court "'may consult references' such as dictionaries to discern the plain meaning of an insurance policy's language." Bioscience W., Inc. v. Gulfstream Prop. and Cas. Ins. Co., 185 So. 3d 638, 640 (Fla. 2d DCA 2016) (quoting Garcia v. Fed. Ins. Co., 969 So. 2d 288,

292 (Fla. 2007)). "If the language used in an insurance policy is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning of the language used so as to give effect to the policy as it was written." Menendez, 70 So. 3d at 569–70 (quoting Travelers Indem. Co. v. PCR Inc., 889 So. 2d 779, 785 (Fla. 2004)). Last, "courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007) (quoting Auto–Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla.2000)).[4]

A reading of the unambiguous Civil Authority provision (together with other applicable Policy provisions) readily yields the conclusion that the mere loss of income or access to property, without more, is insufficient to trigger coverage under the Policy. Instead, that claim must arise from "direct physical damage to property." The Court's resolution of this dispute will therefore turn on the meaning of the undefined phrase "direct physical," which modifies both "damage to property" and risk of "loss." (Doc. 1-1 at 121, 132.)

---

[4] "[I]nsurance policy interpretation . . . is a question of law." Penzer v. Transp. Ins. Co., 29 So. 3d 1000, 1005 (Fla. 2010) (citing Auto–Owners Ins. Co. v. Pozzi Window Co., 984 So.2d 1241, 1246 (Fla. 2008)). "While courts applying Florida law have acknowledged that '[c]ontract interpretation is typically inappropriate at the motion to dismiss stage' for failure to state a claim," they nevertheless "will engage in such interpretation 'where the contract . . . terms are unambiguous.'" Martinair Holland, N.V. v. Benihana, Inc., 780 F. App'x 772, 775 (11th Cir. 2019) (quoting Alhassid v. Bank of Am., N.A., 60 F. Supp. 3d 1302, 1312–13 (S.D. Fla. 2014)).

### I. Direct physical loss or damage to property alters the property's structure.

"The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal," thereby precluding "any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10A Steven Plitt et al., Couch on Insurance § 148:46 (3d ed.), Westlaw (database updated June 2021). "A direct physical loss contemplates an actual change in [] property . . . requiring that repairs be made to" return the property to its original, structural condition. Mama Jo's, Inc. v. Sparta Ins. Co., No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (citation and internal quotation marks omitted), aff'd 823 F. App'x 868 (11th Cir. 2020).

"The plain meaning of the terms 'direct physical loss of or damage to property' unambiguously requires actual, tangible damage to the physical premises itself, not merely economic losses unaccompanied by a demonstrable physical alteration to the premises." Café Int'l Holding Co. v. Westchester Surplus Lines Ins. Co., No. 20-21641-GOODMAN, 2021 WL 1803805, at *8 (S.D. Fla. May 4, 2021). Explained differently, "[a] 'loss' is the diminution of value of something, and in this case, the 'something' is the insureds' . . . property. 'Direct' and 'physical' modify loss and impose the requirement that the damage be actual." Homeowners Choice Prop. & Cas. v. Maspons, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017) (quoting

Loss, Black's Law Dictionary (10th ed. 2014)).[5]  In short, to allege a covered claim under the Policy, Dr. Scherder must allege that his lost income is due to an actual, demonstrable, physical alteration of property.

A reading of the Policy's other lost income provisions supports this conclusion.  For example, along with the Civil Authority provision that Dr. Scherder specifically invokes (Doc. 34 at 7), the Policy also provides for a claim of lost income under the "Practice Income" and "Extra Expense" provisions.  (Doc. 1-1 at 117 § I.A.3.a, 118 § I.A.4.)  Both, like the Civil Authority provision, limit coverage to losses arising from some sort of direct physical damage to property.  (Id.)  But where the Civil Authority provision limits the scope of any claim to "30 consecutive days," the "Practice Income" and "Extra expense" provisions contemplate coverage during a "period of restoration."  (Id.)  The Policy defines a "period of restoration" as the period that "begins 24 hours immediately following direct physical damage . . . caused by or resulting from any [risk of direct physical loss]" and ends "on the date when the property . . . should be repaired, rebuilt or replaced with reasonable speed and similar quality."  (Doc. 1-1 at 134 (emphasis added).)

Dr. Scherder briefly contends that Aspen's motion to dismiss on this point is irrelevant to the specific claims he brings under the Civil Authority provision.

---

[5] See also Physical, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=physical (last visited Aug. 11, 2021) (defining physical as, "Of or relating to material things: a wall that formed a physical barrier; the physical environment [sic]").

(Doc. 34 at 22.)   But the Court cannot analyze the Civil Authority provision in a vacuum.   Instead, the Court must "read [the] policy as a whole, endeavoring to give every provision its full meaning and operative effect."   Anderson, 756 So. 2d at 34. The above provisions and definitions, which confine the scope of coverage for a claim of lost income, provide important context for what "direct physical damage to property" means in the Civil Authority provision.   The "period of restoration" requires that the insured property be repaired, rebuilt, or replaced—implying that the property has suffered physical change to its structure.

It would make little sense for the Policy to contemplate some physical alteration in the "Practice Income" and "Extra expense" provisions but not the Civil Authority provision when all three require "direct physical damage to property" for coverage.   See Nationwide Mut. Fire Ins. Co. v. Olah, 662 So. 2d 980, 982 (Fla. 2d DCA 1995) ("When construing an insurance policy to determine coverage the pertinent provisions should be read in pari materia.").[6]   Thus, the question now becomes whether a virus can physically alter a property's structure.

---

[6] The proposed amended complaint alleges: "As the drafter of the Policy, if Aspen had wished to exclude from coverage loss or damage caused by or resulting from any virus . . . it could have included in the Policy specific language that would have said this, but Aspen did not do so."   (Doc. 29-1 at ¶ 58.)   The lack of an exclusion from coverage in the Policy is meaningless because "the existence or nonexistence of an exclusionary provision in an insurance contract is not at all relevant until it has been concluded that the policy provides coverage for the insured's claimed loss."   Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732, 740 (Fla. 2002).   Thus, Dr. Scherder's argument on this point is "entirely without merit."   Id.

**II.     A virus cannot cause direct physical loss or damage to property under the Policy**.

Dr. Scherder's original Complaint does not allege that Florida's Governor issued the Executive Order because of any direct physical loss or harm coronavirus caused to a property.  Attempting to cut Aspen's motion to dismiss off at the pass, Dr. Scherder proposes an amended pleading alleging that the presence of coronavirus particles on the surface of property impairs its value, usefulness, and normal function.  This, he argues, renders property physically unsafe, in turn causing direct physical loss and damage to the property under the Policy.  (See Doc. 29-1 at ¶¶ 24–37.)  This is a stretch, to put it lightly.  Even though the Court must accept Dr. Scherder's well-pleaded allegations as true and draw all reasonable inferences in his favor at the motion to dismiss stage, he has not (and cannot) plausibly allege that a virus caused direct physical damage to property.  That position both contradicts the plain and ordinary language of the Policy and has routinely been rejected by other cases interpreting identical or nearly identical insurance policy language.

A "virus" is "any of various submicroscopic agents that infect living organisms, often causing disease" which are "[u]nable to replicate without a host cell."  Virus, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=VIRUS (last visited Aug. 11, 2021).  Surely, in ordinary parlance, no one would understand a submicroscopic agent that infects a living organism to be capable of causing direct physical loss or damage to a brick-and-mortar structure, like a dental office building.  Although a virus is a tangible,

microscopic thing capable of "contaminating" property, one simply does not consider that attachment as damaging to a wall, ceiling, or floor—the physical presence of the virus on these structures, notwithstanding.

People may take measures that modify property to protect themselves from any direct physical loss or damage caused by a virus, like putting up plexiglass barriers at a grocery store checkout area. But these physical measures are not there to protect property in the same way that, for example, hurricane shutters and sandbags protect property from direct physical loss or damage. Rather, these measures were meant to protect people from contracting the virus. Town Kitchen LLC v. Certain Underwriters at Lloyd's, London, No. 20-22832-CIV-MORENO, 2021 WL 768273, at *4 (S.D. Fla. Feb. 26, 2021) ("[C]oronavirus particles damage lungs, they do not damage buildings."); Johnson v. Hartford Fin. Servs. Grp., Inc., No. 1:20-cv-2000-SDG, 2021 WL 37573, at *5 (N.D. Ga. Jan. 4, 2021) ("Any 'actual' change [to property where coronavirus is present] is instead premised on the omnipresent specter of COVID-19, a generalized 'alteration' experienced by every home, office, or business that welcomes individuals into an indoor setting across the globe.").

Moreover, the Executive Order says nothing about protecting property—it too protects people and preserves certain types of medical equipment. Dr. Scherder suspended operations not because coronavirus physically damaged any property, but because of a mandate intended to curb the spread of the coronavirus to humans. The Policy's use of the phrase "direct physical" makes clear that coverage is limited

to scenarios when property suffers a material change in its physical structure, something a submicroscopic thing is not ordinarily understood to cause.

### III. The Policy does not cover the mere loss of access to a property without direct physical damage to its structure.

Dr. Scherder posits that a physical loss occurred when the coronavirus rendered his and others' property uninhabitable and unusable for their intended purpose. (Doc. 29-1 at ¶ 48; Doc. 34 at 16–18.) In making this argument, he relies on a few unpersuasive cases from outside the Eleventh Circuit.[7] One problem with these cases (and Dr. Scherder's argument) is that they swim against the tidal wave of "virtually <u>every</u> decision rendered in Florida since the COVID-19 pandemic [that] has reached the same conclusion and required actual physical harm." <u>Graspa Consulting, Inc. v. United Nat'l Ins. Co.</u>, No. 20-23245-CIV, 2021 WL 1540907, at *6 (S.D. Fla. Apr. 16, 2021) (Torres, Mag. J.) (emphasis in original). Put differently, his cases are directly at odds with the requirement that the loss or damage to property physically alter the property's structure—a requirement which Florida's state and federal courts almost universally apply. <u>See, e.g.</u>, <u>Malaube, LLC v. Greenwich Ins. Co.</u>, No. 20-22615-Civ-WILLIAMS/TORRES, 2020 WL 5051581, at *6–8 (S.D. Fla. Aug. 26, 2020) (Torres, Mag. J.) (discussing and rejecting reasoning of Dr. Scherder's cited cases).

---

[7] Dr. Scherder mostly relies on: <u>Studio 417, Inc. v. Cincinnati Insurance Co.</u>, 478 F. Supp. 3d 794 (W.D. Mo. 2020); <u>General Mills Inc. v. Gold Medal Insurance Co.</u>, 622 N.W.2d 147 (Minn. App. 2001); and <u>Prudential Property & Casualty Insurance Co. v. Lillard-Roberts</u>, No. CV-01-1362-ST, 2002 WL 31495830 (D. Or. June 18, 2002). (<u>See</u> Doc. 34 at 16–18.)

Certainly, the Civil Authority provision contemplates coverage if a claim for lost income is "caused by action of civil authority that prohibits access to the [insured] premises."  (Doc. 1-1 at 121 § I.B.13.b.)  Dr. Scherder, however, impermissibly stretches the Policy's language to cover things it plainly does not cover.  His argument assumes "the words 'access to' are somehow implied in the relevant coverage language.  By [Dr. Scherder's] argument, then, 'direct physical loss[]' [of] property is equivalent to 'direct physical loss of <u>access to</u>' property."  <u>AE Mgmt, LLC v. Ill. Union Ins. Co.</u>, No. 20-22925-Civ-Scola, 2021 WL 827192, at *3 (S.D. Fla. Mar. 4, 2021) (emphasis in original).  But that language, which he proposes qualifies "direct physical loss," is not contained in the Policy.  And such an interpretation would render the phrase "direct physical damage to property" a mere nullity.  Again, no person would think a virus to be capable of preventing access to property because the virus physically damaged the property (<u>i.e.</u>, damaged a property's brick and mortar structure)—at least, not in the sense that any person would ordinarily understand these words.  And the Executive Order suspended non-emergency dental procedures because the impact of the coronavirus could harm people—not buildings.

At bottom, Dr. Scherder's loss of income was purely economic.  It did not arise from some physical damage to the dental business's (or any other) property.  Instead, the Executive Order addressed the threat of infection which—while certainly due to a tangible virus—did not and cannot cause direct physical damage

to non-living things. For these reasons, the Civil Authority provision plainly does not cover Dr. Scherder's claim for lost income as pleaded.

**IV.    Amendment would be futile**.

The only question left is whether this case should be dismissed with or without prejudice. Courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Although leave to amend shall be freely given when justice so requires, a motion to amend may be denied on numerous grounds such as . . . futility of the amendment." Maynard v. Bd. of Regents, 342 F.3d 1281, 1287 (11th Cir. 2003) (citation and internal quotation marks omitted). "Leave to amend would be futile if an amended complaint would still fail at the motion-to-dismiss or summary-judgment stage." L.S. ex rel. Hernandez v. Peterson, 982 F.3d 1323, 1332 (11th Cir. 2020) (citing Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007)).

Any amendment here would be futile. Dr. Scherder's claim for lost income arose from an Executive Order which, as previously explained, simply had no relation whatsoever to physical property damage. Nor did the Executive Order place a moratorium on non-emergency dental procedures to prevent the coronavirus from contaminating (and thereby physically damaging) property as one would understand physical damage in ordinary conversation. To the extent one would argue otherwise, the Executive Order assessed any risk of contamination as a hazard to people. Thus, any allegations Dr. Scherder may assert in an amended pleading would still necessarily revolve around how and why that coronavirus-

based Executive Order caused direct physical loss or damage to property. And that is not enough to state a claim under the Policy.

At bottom, the Court accepts that the coronavirus was the catalyst for Dr. Scherder's loss of income and loss of access to his practice. Even so, this alone cannot change the inescapable conclusion that the specific Policy here requires that those losses spring from an alteration of a property's structure; something the coronavirus, like all viruses, just simply cannot do. Last, the Court is mindful and sympathetic to the financial losses Dr. Scherder and his practice sustained. The Court must, however, interpret the insurance Policy as it is written. Although coverage would surely assist Dr. Scherder's business, the Policy issued by Aspen does not allow for coverage under the facts presented here.

Accordingly, it is **ORDERED**:

1. The Motion for Leave to File Amended Complaint (Doc. 29) is **DENIED**.
2. Aspen's Motion to Dismiss (Doc. 19) is **GRANTED**.
3. This case is **DISMISSED WITH PREJUDICE**.
4. The Clerk is **DIRECTED** to terminate any pending deadlines and motions and close the file.

**ORDERED** at Fort Myers, Florida, on August 11, 2021.

*/s/ John L. Badalamenti*
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE